Texas Utilities 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-92-548-CV





TEXAS UTILITIES ELECTRIC COMPANY, PUBLIC UTILITY COMMISSION,


OFFICE OF PUBLIC UTILITY COUNSEL, AND CITIES OF ARLINGTON, ET AL.,



 APPELLANTS


vs.





PUBLIC UTILITY COMMISSION, TEXAS UTILITIES ELECTRIC COMPANY,


OFFICE OF PUBLIC UTILITY COUNSEL, AND CITIES OF ARLINGTON, ET AL.,



 APPELLEES



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT



NO. 91-16609, HONORABLE JOHN DIETZ, JUDGE PRESIDING



 




 Texas Utilities Electric Company, the Public Utility Commission, the Office of
Public Utility Counsel, and the Cities of Arlington, et al. appeal from a district-court judgment
rendered in a suit for judicial review of the Commission's final order in an electric utility rate case
conducted under the Public Utility Regulatory Act (PURA), Tex. Rev. Civ. Stat. Ann. art 1446c
(West Supp. 1994). (1) The district-court judgment reverses and remands certain aspects of the Commission's final order, and affirms the remainder. We will reverse the district-court
judgment and remand the cause to the district court with instructions that the cause be remanded
to the Commission for further proceedings consistent with our opinion. See Administrative
Procedure Act (APA), Tex. Gov't Code Ann. § 2001.174 (West 1994). (2) 



THE CONTROVERSY


 Texas Utilities filed its application for a rate increase in January 1990 seeking to
include in its rate base costs associated with Comanche Peak, a newly constructed nuclear power
plant. The utility sought an agency adjudication regarding what portion of its costs it could
include in its rate base as being a "prudent" investment, public interest findings on its
reacquisition of a 12.2 percent ownership interest in the plant, final reconciliation of its fuel costs
and revenues for the period April 1983 to June 1989, and a reduction of its fuel factor for the
period May 1990 to April 1991. After the Commission issued its order, motions for rehearing
were filed and the Commission issued a second order on rehearing. Subsequent motions for
rehearing were overruled by operation of law, and five parties to the rate-making proceeding filed
suit for judicial review in district court. See PURA § 69; APA § 2001.171. The district court
affirmed the Commission order in part and reversed it in part, after which Texas Utilities, Public
Utility Counsel, the Cities, and the Commission each appealed the district-court judgment. (3) For
clarity, we will provide additional facts germane to the various points of error throughout the
opinion.



CONFLICT OF INTEREST


 In their first point of error, the Cities and Public Utility Counsel argue that the
chairman of the Commission, Paul Meek, was biased because he had a pecuniary interest in the outcome of the proceedings, and because he was prejudiced in favor of the gas industry. The
allegations of impermissible bias center around Meek's ties with American Petrofina ("Fina"). 
During the rate-making proceedings, Meek served as chairman of Fina's board, received
retirement benefits from Fina, and held shares of its publicly traded common stock. Fina's direct
sales of natural gas to Texas Utilities from 1989 to 1991 totalled $60,782; indirect revenue from
sales to other Texas Utilities suppliers approximated $104 million. Because of his connections
with Fina, the Cities and Public Utility Counsel claim that Meek's participation in the hearings
precluded the Commission from making impartial findings. The district court found the evidence
insufficient to show that Meek's service on the Commission led to unfair proceedings or
prejudiced substantial rights of the parties. We agree.

 PURA provides that no commissioner may, during a period of service with the
Commission, "have any pecuniary interest . . . in any person or corporation or other business
entity a significant portion of whose business consists of furnishing goods or services to public
utilities or affiliated interests . . . ." PURA § 6(b)(1). It is grounds for removal from the
Commission if a member has interests in violation of section 6(b) at the time of his or her
appointment. PURA § 6A. However, "the validity of an action of the commission is not affected
by the fact that it was taken when a ground for removal of a member of the commission existed." 
PURA § 6A(b). Meek resigned from the Commission effective April 20, 1992, after the Attorney
General requested that he either sever all ties with Fina or resign from the Commission. Although
Meek was not removed from the Commission because of a conflict of interest pursuant to PURA
section 6A, he did resign in the face of a perceived conflict. Meek's conflict, however, has no
effect on the Commission's order in Docket 9300. PURA § 6A(b). This Court is left, therefore,
with the power to reverse and remand the Commission's order only if Meek's participation
resulted in an order that prejudices substantial rights of the appellants. See APA § 2001.174. (4) 
We understand appellants to contend that this Court should reverse the Commission's order
because Meek's interests in Fina resulted in an order that is arbitrary and capricious and a
violation of their constitutional right to a fair and impartial hearing.

 In order to prevail, appellants must overcome the presumption that agency members
are persons of conscience and intellectual discipline, capable of judging a particular controversy
fairly on the basis of its own circumstances. United States v. Morgan, 313 U.S. 409, 421 (1941). 
Following the United States Supreme Court, we recognize a presumption of honesty and integrity
in those serving as adjudicators. Withrow v. Larkin, 421 U.S. 35, 47 (1975). One may overcome
this presumption by demonstrating that the decisionmaker's mind is "irrevocably closed" on the
matters at issue. Federal Trade Comm'n v. Cement Inst., 333 U.S. 683, 701 (1948). During
confirmation hearings conducted in May 1990, the Texas Senate fully explored the issue of
Meek's conflict. At that time, aware of Meek's connections with Fina, the Senate satisfied itself
that Meek could execute his duties as commissioner impartially and without prejudice in favor of
the gas industry. Additionally, Meek promised to recuse himself from voting on any contested
issue regarding contracts between public utilities and Fina, a promise he upheld by not reviewing
contracts between Texas Utilities and Fina. (5) 

 It is well established that absent a showing of incapability to decide a particular
controversy fairly, an administrative officer is not disqualified simply because he or she has
previously taken a position, even in public, on a policy issue related to a particular dispute. 
Morgan, 313 U.S. at 421. In Morgan, the Supreme Court held that the Secretary of Agriculture's
strong views on a particular issue did not make him unfit to exercise his duties in administrative
proceedings relating to those matters. Id. Similarly, in Cement Institute the Court held that
members of the Federal Trade Commission were not disqualified from participating in
adjudicatory proceedings simply because they had previously expressed their opinions that a
pricing system at issue in the proceeding was illegal. Cement Institute, 333 U.S. at 700-01.

 In this appeal, the Cities and Public Utility Counsel question Meek's impartiality
because of a newspaper interview in which he expressed his disappointment with the
Commission's decision to disallow $1.3 billion of Comanche Peak costs. The Supreme Court has
decided, however, that public criticism "is a practice familiar in the long history of . . .
litigation," and that while an administrator may have an underlying philosophy in approaching a
specific case, he or she may still be assumed to be a person of conscience and intellectual
discipline, capable of judging a particular controversy fairly. Morgan, 313 U.S. at 421. 

 The Cities and Public Utility Counsel argue that this order should be invalidated,
relying on American Cyanamid Co. v. Federal Trade Commission, 363 F.2d 757 (6th Cir. 1966). 
In American Cyanamid, the court invalidated a commission order because one of the
commissioners had previously served as counsel for a Senate subcommittee investigating many
of the same facts and issues that later came before the commission. The court found that the
commissioner's dual investigative and adjudicative experiences with the issues involved in the
hearing created a risk that commission decisions might be based on evidence outside the record. 
It was the presentation of nonrecord evidence, not the commissioner's personal viewpoints, that
led the court to invalidate the order. American Cyanamid, 363 F.2d at 767. In this case,
however, appellants base their request for invalidation of the order on assertions that Meek's
personal views about the gas industry made it impossible for him to decide the issues fairly. 
Under the circumstances of this proceeding, we cannot agree.

 We do not express any opinion regarding whether Meek should have been removed
from the Commission had he not resigned. This Court is limited to the judicial review enumerated
in APA section 2001.174. We conclude that Meek's involvement with Fina and his opinions
about the gas industry have not been shown by the complaining parties to have resulted in a
deprivation of the right to an impartial and fair hearing before the Commission, nor has it been
shown that he exhibited bias such that his votes were necessarily arbitrary and capricious. The
Cities and Public Utility Counsel's first point of error is overruled.



REACQUISITION OF MINORITY INTERESTS


 All appellants bring points of error related to the district court's disposition of the
Commission order disallowing more than $908 million spent to repurchase 12.2 percent of
Comanche Peak from minority interest owners and to settle litigation arising from the joint
ownership of the project. Section 63 of PURA permits the Commission to disallow certain
expenses associated with transactions involving changes in public utility ownership. The
Commission's authority to make disallowances under section 63 is limited to three specific types
of transactions: (1) the acquisition, sale or lease of any plant as an operating unit in the state of
Texas for a total consideration in excess of $100,000; (2) a public utility's merger or consolidation
with another public utility operating in the state; and (3) the sale of fifty percent or more of a
public utility's stock. (6) When any one of these transactions takes place, the utility must file a
report with the Commission, which then investigates the transaction to determine whether it is in
the public interest. In making this determination, the Commission is to consider the reasonable
value of the property, facilities or securities involved. If the Commission finds that the
transaction was not in the public interest, it must "disallow the effect of such transaction if it will
unreasonably affect rates or service." PURA § 63. 

 In reviewing the costs associated with the construction of Comanche Peak, the
Commission exercised its authority under section 63 to make a disallowance of $908,688,938. 
The Commission asserted that it had jurisdiction to make disallowances pursuant to section 63
because Texas Utilities' repurchase of certain minority interests in the Comanche Peak project
constituted the purchase of a plant or unit as an operating system for consideration in excess of
$100,000. Texas Utilities' second motion for rehearing filed with the Commission included an
assignment of error stating:



The Commission erred in concluding that PURA § 63 controls this Commission's
review of [Texas Utilities'] reacquisition of minority owner interests in Comanche
Peak, for the reason that, as a matter of law, PURA § 63 does not apply to the
transfer between joint owners of partial, undivided interests in a plant and does not
apply to a plant under construction that is not operating.



When this second motion for rehearing was overruled by operation of law, Texas Utilities sought
review in the district court, and continued to maintain that the Commission had improperly applied
section 63 to the repurchase of minority interests in the project. As part of its appeal to this
Court, Texas Utilities contends in its second point of error that the Commission's section 63
review was an error of law. 

 The Cities, Public Utility Counsel, and the Commission each argue that Texas
Utilities has waived its right to challenge the Commission's decision to proceed under section 63
because it was the utility that initially identified section 63 as one of the provisions giving the
Commission jurisdiction over the rate-making proceeding. (7) Administrative agencies, however,
have only those powers that are expressly conferred by statute, together with those necessarily
implied from the authority conferred or the duties imposed. State v. Jackson, 376 S.W.2d 341,
344 (Tex. 1964) (citing Stauffer v. City of San Antonio, 344 S.W.2d 158, 160 (Tex. 1961));
Sexton v. Mount Olivet Cemetery Ass'n, 720 S.W.2d 129, 142 (Tex. App.--Austin 1986, writ ref'd
n.r.e.). Jurisdiction cannot be conferred upon the agency by the parties before it, but rather must
emanate from the statute itself. See Nueces County Water Control & Improvement Dist. v. Texas
Water Rights Comm'n, 481 S.W.2d 924, 929 (Tex. Civ. App.--Austin 1972, writ ref'd n.r.e.) ("If
the statutes do not grant the board the power to do a thing, then it has no such power."). If the
utility's reacquisition of minority interests in Comanche Peak is not one of the specific
transactions identified in section 63 of PURA, the Commission has no jurisdiction to make
disallowances based on the standards set forth in that section; such jurisdiction cannot be
conferred on the Commission simply because the parties have requested or agreed to it. 

 This Court has the power, as well as the duty, to review the agency's interpretation
and application of a statute. See Railroad Comm'n v. Lone Star Gas Co., 599 S.W.2d 659, 662
(Tex. Civ. App.--Austin 1980, writ ref'd n.r.e.) (stating that an agency's duty is to carry forward
the directives of statutes, and the courts review agency orders to ensure that statutes are enforced). 
In reviewing the Commission's order, we are therefore obliged to determine whether the
repurchase of minority ownership interests is a transaction contemplated by section 63 of PURA. 
If it is not, the Commission had no authority to conduct a section 63 review, and we may not
uphold that portion of the order. Accordingly, we first examine the repurchase at issue in this
case to determine if it falls within the scope of transactions the Commission is directed to review
under PURA section 63.

 In August 1973, Texas Utilities' corporate predecessors, Dallas Power & Light
Company, Texas Power & Light Company, and Texas Electric Service Company, signed a
memorandum of agreement to design, construct, and operate the Comanche Peak nuclear power
plant. (8) Texas Utilities originally intended to own the entire plant, but was required to sell
ownership interests in the project in order to receive construction permits from the Nuclear
Regulatory Commission (NRC). In 1974, Texas Utilities agreed to allow participation in the
ownership of Comanche Peak, thereby eliminating antitrust concerns associated with the issuance
of the construction permits. By 1979, Texas Municipal Power Agency and Brazos Electrical
Power Cooperative had acquired ownership shares of 6.2 percent and 3.8 percent respectively. (9) 
In 1982, Tex-La Electric Cooperative of Texas became another co-owner of the Comanche Peak
project. Because Tex-La had raised antitrust issues with the Department of Justice and had filed
a petition to intervene in the Comanche Peak antitrust review related to its application for an
operating license, Texas Utilities agreed to sell Tex-La a 4.3 percent interest in the project. 
Before the closing, however, Tex-La reduced its purchase to 2.2 percent of the project. The joint
operating agreement was amended to reflect this sale. (10) The Commission granted certificates of
public convenience and necessity for all three sales of ownership interests in the project. (11)

 The joint ownership agreement began to deteriorate over time. In May 1985,
Brazos Electrical Power Cooperative ceased making its contractual payments to Texas Utilities. 
In early 1985, Tex-La Electric Cooperative made several late payments, and thereafter stopped
making payments altogether. Texas Municipal Power Agency continued to make payments, but
it made them under protest. Thereafter, the minority interest owners claimed that Texas Utilities
had failed to meet its responsibilities under the joint ownership agreement, resulting in rising
costs, schedule delays, and licensing problems. The three minority interest owners contended that
they were therefore relieved of any obligation to pay their percentage costs of the construction and
operation of the project.

 Texas Utilities sued for breach of contract, seeking monetary damages and a
declaratory judgment affirming the minority interest owners' continuing obligation to pay their
share of the plant's remaining costs. The minority interest owners filed counterclaims alleging
mismanagement of the project, breach of contract, and deceptive trade practices. Faced with
mounting litigation costs, Texas Utilities settled with the minority interest owners by repurchasing
their undivided interests in the project. (12) The settlement agreements ended all litigation between
Texas Utilities and the minority interest owners. The repurchases were approved by the
Commission which, as previously noted, indicated its intention to review the repurchase of these
minority interests under PURA section 63 in the future rate-making proceedings. 

 As part of Docket 9300, the Commission did in fact conduct the section 63 review. 
The Commission determined that the repurchase was in the public interest "to the extent that
[Texas Utilities] paid a reasonable value for the repurchased capacity." The Commission found
that the utility had reacquired the minority interests by paying $4,765 per kilowatt--the cost of
building Comanche Peak. By contrast, the Commission decided that a "reasonable value" would
be $1,865 per kilowatt, the cost of building a stand-alone "generic coal plant" with 12.2 percent
of Comanche Peak's capacity. As a result, the Commission determined that Texas Utilities had
paid $2,900 more per kilowatt than was "reasonable." (13) Accordingly, the Commission disallowed
the excess purchase price amounting to almost $812 million. The Commission also disallowed
the utility's reimbursement of the minority interest owners' litigation costs, amounting to $72,684
million, and $24,662 million of the total consideration paid for the nuclear fuel.

 The district court concluded that although review under section 63 of PURA was
appropriate, the Commission made disallowances that were arbitrary and capricious and not
supported by substantial evidence. In two jointly raised points of error, the Cities and Public
Utility Counsel assert that the district court erred in remanding some of the Commission's findings
of fact and that the Commission properly carried out its section 63 review. They do not challenge
the propriety of the section 63 review. The Commission also brings two separate points of error
relating to its section 63 review, contending that it properly applied section 63 and that its findings
of fact were supported by substantial evidence. We do not address these points of error because
our conclusion that the repurchase of the undivided minority interests in the plant are not
transactions reviewable under section 63 renders moot any further controversy about what would
constitute a proper disallowance under that provision. (14)

 As previously noted, section 63 applies to three types of transactions: (1) the
purchase, sale or lease of a plant or unit as an operating system for consideration in excess of
$100,000; (2) sales of more than fifty percent of the stock of a public utility; and (3) a merger or
consolidation of two public utilities. Texas Utilities' repurchase of the undivided ownership
interests sold to Texas Municipal Power Agency, Brazos Electrical Power Cooperative, and Tex-La Electric Cooperative falls into none of these categories. Rather than repurchasing a "plant or
unit," Texas Utilities acquired the undivided ownership interests of three tenants-in-common. 
Under the joint ownership agreement, the co-tenants had waived any right to partition the
interests, thereby foreclosing the possibility of identifying any part of the plant as belonging
specifically to any co-tenant. The fallacy in the Commission's analysis is its assumption that the
minority interests translate into a complete and independently operable portion of Comanche Peak,
ownership of which changed hands when the repurchase took place.

 The Cities and Public Utility Counsel argue that excluding the repurchase of the
undivided interests from the scope of a section 63 review renders the provision meaningless. 
They contend that it is illogical to conclude that "a statute concerned with transactions of at least
$100,000 would not apply to a transaction 1,000 times greater than that amount." This argument
fails because the element that triggers section 63 review is not the amount of money involved in
the transaction, although the legislature has set a $100,000 minimum presumably to exclude
transactions so small that there is no real risk they will unreasonably affect rates or service. 
Rather, section 63 is concerned with certain types of transactions that result in changes of
ownership of the utility or its operating units to ensure that the costs of transactions inconsistent
with the public interest are not assessed against the ratepayers. We conclude that the Commission
erred in reviewing the costs associated with the minority interests under PURA section 63. 

 In its final judgment, the district court reversed and remanded for reconsideration
on the existing record the following specific findings of fact related to the minority interest
repurchases:



149. For the reasons discussed in Section VII.C.2. of this Report, [Texas
Utilities] failed to prove that the consideration it paid for the repurchased
12.2 percent interest in the plant was reasonable.


150. For the reasons discussed in Section VII.C. of this Report, [Texas
Utilities'] repurchases of the minority owners' interests in Comanche Peak
are consistent with the public interest to the extent that [Texas Utilities]
paid a reasonable value for the repurchased capacity.


151. For the reasons discussed in Section VII.C. of this Report, all amounts in
excess of the reasonable value of the repurchased interests should be
disallowed from invested capital as unreasonably affecting rates.


152. For the reasons discussed in Section VII.B.2.d. and Section VII.D. of this
Report, a reasonable value of the repurchased interests in Comanche Peak
is $1,856 per kW.


153. For the reasons discussed in Section VII.D. of this Report, the reasonable
value of $1,856 per kW should apply to valuating the repurchased interests
in Unit 1 and Unit 2.


153A. Consistent with an estimated fuel cost for Comanche Peak of $11 billion,
the test-year-end cost of $5.938 billion should be used to value the
repurchased 12.2 percent interest in Unit 1 and an estimated cost of $5.0
billion should be used to value the repurchased 12.2 percent interest in Unit
2.


153B. The plant disallowances related to the repurchased 12.2 percent interest in
Unit 1 is $462,764,691; the plant disallowance related to the repurchased
12.2 percent interest in Unit 2 is $348,578,247. Taken together, the total
plant disallowance related to the repurchased 12.2 percent interest in the
entire plant is $811,342,938.


154. For the reasons discussed in Section VII.E. of this Report, the $72.684
million in minority owners' litigation expenses reimbursed by [Texas
Utilities] as part of the settlement agreements should be disallowed.


 * * * *


156. As modified by Findings of Fact 153A and 153B, Section VII.F. of this
Report indicates the disallowances for Unit 1 and Unit 2, as calculated in
Section VI. (Prudence) and Section VII. (Reacquisition of Minority Owner
Interests). The total Unit 1 disallowance is $847,004,966; the total Unit 2
disallowance is $534,139,597. Taken together, the total disallowance is
$1,381,144,563.



 The purpose of remanding these findings was to allow the Commission to
reconsider the "reasonable value" it assigned the repurchased interests, presumably to make an
upward adjustment in its $1,856 per kilowatt valuation to reflect the "intangible" benefits of
repurchasing the minority interests. The district court instructed the Commission to consider not
only the "economic value" of the property and facilities acquired, but also benefits gained from
terminating expensive and time-consuming litigation that jeopardized the entire project. We
affirm the district court's rejection of these findings of fact based on our conclusion that the
Commission erroneously reviewed the repurchases under PURA section 63 and failed to evaluate
the repurchase price in light of the relevant statutory considerations. We reverse that portion of
the district court's judgment affirming the Commission's disallowance of $24,662,000 of the cost
to Texas Utilities of repurchasing nuclear fuel from the minority interest owners. This payment
was part of the overall settlement cost and should be reviewed under the prudent investment
standard along with all other costs related to the repurchase. The Commission has already
approved the utility's decision to settle the dispute with the minority interest owners; (15) on remand,
we direct the Commission to consider, under the prudent investment standard, the price paid for
the repurchase, including the litigation costs and repurchase of nuclear fuel at its original cost. (16)



FEDERAL INCOME TAX EXPENSE


 In points of error seven through ten, the Cities and Public Utility Counsel complain
that the district court erred in affirming the Commission's calculation of the utility's federal
income tax expense. They contend that the Commission's calculation (1) improperly employed
the hypothetical rather than the actual-tax method, (2) failed to account for tax savings resulting
from the utility's consolidated tax return, (3) did not reflect deductions for actual interest expense,
and (4) failed to reflect deductions taken for below-the-line expenses, including disallowed
Comanche Peak plant costs. 

 We sustain the seventh point of error complaining of the Commission's use of the
hypothetical tax method. The mandate from the supreme court is clear: "The utility's rates must
reflect the tax liability actually incurred." Public Util. Comm'n v. Houston Lighting & Power
Co., 748 S.W.2d 439, 442 (Tex. 1987). This Court has repeatedly affirmed that statement by
consistently requiring the Commission to employ the actual-taxes-paid doctrine. See City of Alvin
v. Public Util. Comm'n, No. 3-92-459-CV, slip op. at 17 (Tex. App.--Austin June 1, 1994, no
writ h.); Cities of Abilene v. Public Util. Comm'n, 854 S.W.2d 932, 944 (Tex. App.--Austin 1993,
writ requested); Public Util. Comm'n v. GTE-SW, 833 S.W.2d 153, 159 (Tex. App.--Austin 1992,
writ granted). Furthermore, under the actual-taxes-paid test, "any utility tax savings must benefit
ratepayers." Cities of Abilene, 854 S.W.2d at 945 (emphasis added). In this case, as well, we
reject the Commission's refusal to adhere to binding precedent.

 The Cities and Public Utility Counsel's eighth point of error asserts that the
Commission erred when it failed to adjust its calculation of the utility's tax expense to reflect
savings that resulted from the utility's filing a consolidated tax return. The Commission rejoins
that its decision not to allocate any of the savings to the utility was consistent with PURA section
41(c)(2) and cases construing that statutory provision. Section 41(c)(2) states:



If the public utility is a member of an affiliated group that is eligible to file a
consolidated income tax return, and if it is advantageous to the public utility to do
so, income taxes shall be computed as though a consolidated return had been so
filed and the utility had realized its fair share of the savings resulting from the
consolidated return, unless it is shown to the satisfaction of the regulatory authority
that it was reasonable to choose not to consolidate returns.



Texas Utilities argues that this statute only applies when the utility has not filed a consolidated
return. We disagree. The statute provides that, regardless of whether the utility actually filed a
consolidated return, the Commission must calculate the utility's income tax expense as though it
had received any tax benefits a consolidated return would provide. Once the Commission
determines that a consolidated filing would have been, or was, advantageous to the utility, the
Commission must adjust the utility's tax expense to reflect those savings. If the Commission does
not reduce the utility's tax expense to reflect the utility's tax savings, it violates the actual-tax
doctrine's underlying principle that rates must be set based on the utility's actual tax liability. 
GTE-SW, 833 S.W.2d at 166.

 The Commission argues that it was not required to allocate any of the tax savings
from the consolidated filing to the utility because it specifically found that the consolidated filing
was not advantageous to the utility. See Finding of Fact 331A. In Cities of Abilene we held that
no adjustment to income tax expense is necessary under PURA section 41(c)(2) if the Commission
finds either (1) that it was not advantageous to the utility to consolidate returns, or (2) that the
Commission has computed taxes as though a consolidated return were filed and the utility has
received its fair share of the savings from the consolidated return. Cities of Abilene, 854 S.W.2d
at 944. In this case, the Commission relied on its own conclusion that the utility's fair share of
the savings was zero to support its finding that the consolidated return was not advantageous to the utility. We will uphold the Commission's decision only if it properly found
that the utility's fair share of the tax savings was zero. 

 Finding of fact 331D states:


The federal income tax savings resulting from the filing of a consolidated federal
income tax return should accrue to the entity that provided the tax attributes that
allowed for such savings, and [Texas Utilities] was not the entity that provided
such tax attributes.


This Court has previously decided that even when it is the utility's affiliates that have suffered
losses and provided "the tax attributes that allowed for savings," those savings must be passed on
to the ratepayers. GTE-SW, 833 S.W.2d at 167. In finding of fact 331F, the Commission asserts
that it would be unfair to allocate to the utility tax savings resulting from the affiliates' losses
because the utility will never be responsible for paying the affiliates' taxes when "timing
differences reverse and those affiliates have taxable income." Again, this Court has rejected that
argument. GTE-SW, 833 S.W.2d at 167 n.16 (inequity resulting from ratepayers' benefitting from
tax savings not offset by obligation to pay higher rates in the event of affiliates' gains is a matter
for the legislature to remedy by amending PURA section 41(c)(2)). Similarly, finding of fact
331H, that Texas Utilities should not benefit from tax savings attributed to affiliates because it
bears none of the risks associated with those entities, conflicts with existing caselaw. The
Commission's finding that the consolidated tax return was not advantageous cannot rest upon its
own improper refusal to allocate any savings to the utility. Having rejected several of the findings
supporting the Commission's conclusion that the utility's fair share of the tax savings is zero, we
are unable to uphold that conclusion. There is no indication that each finding is independently
sufficient to support the conclusion. We therefore sustain the Cities and Public Utility Counsel's
eighth point of error.

 The ninth point of error objects to the Commission's failure to adjust the tax
expense calculation to reflect actual-interest-expense deductions. The Commission is required to
allocate tax savings to ratepayers rather than to shareholders. The actual-tax doctrine requires that
the ratepayers be held accountable only for "those tax expenses that are actually incurred by a
utility." Houston Lighting & Power, 748 S.W.2d at 442. If the utility enjoys a tax deduction
based on interest expense, the benefits of that deduction must be passed on to the ratepayers. In
City of Alvin, however, we rejected the argument that the Commission must pass on immediately
the entire savings related to a utility's tax deductions. City of Alvin, No. 3-92-459-CV, slip op.
at 18 ("Section 27(e) of PURA directs the Commission to distribute [tax savings benefits] to all
ratepayers, however, both present and future. We will not interpret Houston Lighting as
mandating that present ratepayers receive all the benefits of accelerated depreciation."). We
sustain the point of error to the extent that we continue to require the Commission to pass through
to ratepayers any tax benefits from interest expense deductions. However, the Commission must
allocate those savings between present and future ratepayers, and the proper allocation is within
the Commission's discretion. 

 The Cities and Public Utility Counsel's tenth point of error contends that the
Commission erroneously excluded tax benefits resulting from below-the-line expenses, including
tax deductions related to expenses disallowed as imprudently incurred. This Court has already
decided that PURA requires that the Commission reduce the utility's income tax expense by the
amount of tax deductions, even if they are associated with disallowed capital expenses. City of
Alvin, No. 3-92-459-CV, slip op. at 17 (citing GTE-SW, 833 S.W.2d at 169). We remain
unpersuaded by the Commission's argument that the actual-tax doctrine conflicts with the
normalization rules. See City of Alvin, No. 3-92-459-CV, slip op. at 18. We sustain the tenth
point of error.


BONDED RATES


 In their twenty-first point of error, the Cities challenge the Commission's authority
to allow Texas Utilities to implement bonded rates in both the municipal and non-municipal
sections of its service area. (17) Disposition of this point of error requires an interpretation of PURA
section 43(e). This appeal presents the first opportunity for this Court to consider the bonded-rate
provision of the statute since its amendment in 1983. 

 When an electric utility wishes to change its rates it must follow the procedures
outlined in PURA section 43. (18) The utility initiates rate proceedings by filing a statement of intent to change rates with the regulatory authority having original jurisdiction. PURA § 43(a). (19) 
In all proceedings involving major rate changes, (20) the regulatory authority having original
jurisdiction must hold a hearing on the proposed rate schedule. PURA § 43(c). Pending the
hearing, the regulatory authority may suspend implementation of the new rate schedule. If the
original proceeding involves a proposed increase in the rates charged in municipal areas, the
municipality holds the hearing and has ninety days in which to come to a final decision. If the
municipality has made no final disposition of the rate proceeding at the expiration of ninety days,
the proposed rate schedule is deemed to have been approved and the municipality loses jurisdiction
over the proceeding. PURA § 43(d). If an order is issued, any party to the proceeding may seek
de novo appellate review in the Commission. PURA § 26(a), (g).

 Because most utilities provide services in both municipal and non-municipal areas,
there is usually a parallel proceeding originating in the Commission to consider the same proposed
rate increase as it affects non-municipal areas. The Commission, however, has a 150-day period
of original jurisdiction over its portion of the rate proceeding. In addition, the Commission is
allowed two days for each day of hearings in excess of fifteen days. The practical result of
allowing the Commission a longer period of original jurisdiction is that it can wait for the
municipality to issue a final appealable order and then consolidate de novo appellate review with
its own consideration of the same proposed rate increase in non-municipal areas. Therefore, the
Commission typically exercises its original and appellate jurisdiction concurrently.

 In these consolidated rate proceedings, the Commission has 150 days plus two days
for each day of hearings in excess of fifteen days in which to make a final determination. When
the Commission is faced with a particularly complex rate proceeding, protracted hearings can
mean a utility's proposed rate schedule may not take effect for a long period of time. (21) The term
"regulatory lag" is used to describe the economic consequences of this delay. (22) In order to protect
utilities from the financial harm engendered by prolonged regulatory lag, PURA section 43(e)
provides that in cases in which the Commission has failed to render a final order within 150 days
of the proposed effective date of the rate increase, the utility



may put a changed rate, not to exceed the proposed rate, into effect upon the filing
with the regulatory authority of a bond . . . . The utility concerned shall refund
or credit against future bills all sums collected . . . in excess of the rate finally
ordered plus interest at the current rate as finally determined by the regulatory
authority. (23)



PURA § 43(e). This practice is known as "bonding in" rates and is used to relieve the potential
financial hardship imposed on a utility while it awaits a final Commission order on its requested
rate increase.

 In Docket 9300, Texas Utilities requested the same rate increase throughout its
entire service area, encompassing both municipal and non-municipal areas. As permitted by the
1983 amendments to PURA, the Commission reviewed the proposed rate increase in municipal
areas under its appellate jurisdiction at the same time it considered the increase in non-municipal
areas under its original jurisdiction. When 150 days had passed without the Commission's having
reached a final determination, the utility decided to implement bonded rates throughout its entire
service area, and pursuant to PURA 43(e) requested that the Commission approve its bond. The
Cities objected to Texas Utilities' request for bonded rates in municipal areas, maintaining that
PURA prohibits bonded rates in municipal areas once the municipality has lost its original
jurisdiction over the rate proceeding. (24) The Commission rejected this argument and determined
that PURA's bonding provision does not prohibit a utility from implementing bonded rates in
municipal areas when the underlying rate increase is subject to the Commission's appellate
jurisdiction. We conclude that the Commission's interpretation of PURA section 43(e) is correct.

 Section 43(e) contains no language that limits the bonding provisions to rates being
considered under the Commission's original jurisdiction:



If the 150-day period has been extended, . . . and the commission fails to make its
final determination of rates within 150 days from the date that the proposed change
would have gone into effect, the utility concerned may put a changed rate, not to
exceed the proposed rate, into effect upon the filing with the regulatory authority
of a bond . . . .



PURA § 43(e). In support of its contention that the utility may implement bonded rates only for
those rates subject to the Commission's original jurisdiction, the Cities rely on two pre-1983 cases
holding that the former version of section 43(e) did not permit bonded rates in areas under the
Commission's appellate jurisdiction. See Lone Star Gas, 656 S.W.2d at 425; Arkansas Louisiana
Gas Co. (Arkla) v. Railroad Comm'n, 586 S.W.2d 643 (Tex. Civ. App.--Austin 1979, writ ref'd
n.r.e.). We conclude that the reasoning of those cases is so closely tied to the wording of PURA
before the 1983 amendments that they do not support the Cities' interpretation of amended section
43(e). (25) 

 In Lone Star Gas the supreme court recognized the hardship created by PURA's
failure to provide for bonded rates during an extended period of appellate review, but commented
that "any changes in the protection afforded the utility should be made by the legislature." 656
S.W.2d at 425. Perhaps responding to the court's invitation to act, in 1983 the legislature
significantly amended PURA and apparently cured this particular hardship. See GTE-SW, 833
S.W.2d at 173 (noting that an almost identical bonded rate provision in the new Gas Utility
Regulatory Act cured the problems caused by the utility's inability to implement bonded rates in
municipal areas pending review de novo by the Commission).

 Without the ability to bond in rates, a utility's only avenue for relief from
regulatory lag in city rates, traditionally the lion's share of its service area, would be to request
interim rates. See PURA § 26(g) (allowing the Commission to authorize interim rates if
"necessary to effect uniform system-wide rates"). This would necessitate a bifurcated process of
considering the request for interim city rates while contemporaneously implementing bonded rates
outside city limits. Such an inefficient and unwieldy process undermines the amended statutory
scheme designed to consolidate consideration of system-wide rates in one proceeding. 
Furthermore, interim rates that require a hearing do not provide relief from regulatory lag
equivalent to the bonding provision which permits implementation of new rates without
Commission approval, subject only to a bond adequate to ensure possible refunds. We see no
suggestion in the amended version of section 43(e) that utilities should be limited to seeking
interim rates to cure regulatory lag in areas servicing cities. (26)

 The Commission's interpretation of section 43(e) is entitled to great weight,
provided it is reasonable and does not contradict the plain language of the statute. Tarrant
Appraisal Dist. v. Moore, 845 S.W.2d 820, 823 (Tex. 1993). The Commission's construction
of the bonding provision is consistent with the statutory scheme embodied in the 1983 amendments
designed to facilitate contemporaneous disposition of system-wide rates in a single proceeding. 
It also affords the utility protection from regulatory lag through bonded rates, whether inside or
outside city limits. Nothing in the statute itself or the relevant case law supports the Cities'
restricted reading of section 43(e). We overrule the Cities' twenty-first point of error.



RATE BASE ALLOWANCES


 In points of error two through four, the Cities and Public Utility Counsel complain
that the district court improperly upheld various aspects of the Commission's order on rehearing
relating to the prudence phase of the rate-making proceeding. Specifically, they contend that the
Commission's disallowance of Comanche Peak costs is contrary to substantial evidence and
inconsistent with the Commission's factual determinations regarding the insufficiency of Texas
Utilities' proof and with Texas law regarding the burden of proof. The Cities and Public Utility
Counsel assert that reasonable minds could not reach the decision arrived at by the Commission
regarding the reasonable cost of Comanche Peak, and that the Commission failed to disallow
imprudent project costs as required by statute. See PURA §§ 39, 41. 

 In August 1972, Texas Utilities announced its plan to build Comanche Peak, its
first nuclear power plant. In 1977, the utility estimated that Comanche Peak Unit 1 would be
commercially operable in 1981, and Unit 2 would achieve commercial operation in 1983. The
total estimated cost of the project was $1.7 billion, including an allowance for funds used during
construction (AFUDC). However, Unit 1 did not become commercially operable until August
1990. At the rate-making proceeding, the examiners attributed this substantial delay to Texas
Utilities' inability to obtain an operating license from the NRC. See Examiners' Report at 5. (27) 
 Docket 9300 addressed the prudence of costs incurred by the utility in responding
to the NRC's concerns; the utility engaged in an unprecedented revalidation and reinspection
program which caused Comanche Peak costs to nearly double. The Commission, which heard
three explanations for these costs, was charged with determining which costs were prudent. Texas
Utilities contended that the NRC unforeseeably and unreasonably applied stricter licensing
standards to Comanche Peak, forcing the utility to implement an expensive and time-consuming
revalidation and reinspection program in order to obtain an operating license. The utility took the
position that all of these were regulatory costs that should be included in rate base. At the other
end of the spectrum, the Cities and Public Utility Counsel argued that imprudent project
management caused the NRC to lose confidence in Comanche Peak's safety, and that all post-1984
costs incurred in responding to these concerns should be disallowed as imprudent. The
Commission's general counsel, supported by an evaluation conducted by the Nielsen-Wurster
Group, an independent auditor, concluded that Texas Utilities' inability to obtain an operating
license resulted from the NRC's significant, but unfounded, quality concerns. The general
counsel maintained that certain costs should, however, be disallowed based on Nielsen-Wurster's
findings that the utility acted imprudently in discrete instances during the life of the project. The
Commission reviewed the evidence presented by the parties and general counsel and determined
that $537.90 million of Comanche Peak costs were imprudently incurred and should be
disallowed. 

 To support the assertion that the Commission erred in the prudence phase of Docket
9300, the Cities and Public Utility Counsel make three basic points: (1) Texas Utilities did not
sustain its burden of proof on the prudence of its Comanche Peak expenditures, (2) Texas Utilities
did not properly quantify its imprudent Comanche Peak costs, and (3) the Nielsen-Wurster report
does not constitute substantial evidence to support the Commission's determination of which
Comanche Peak costs were imprudently incurred. Taken together, these points assert that the
evidence presented during 203 days of hearings cannot support the Commission's final order with
respect to disallowances. See APA § 2001.174(E); Texas Health Facilities Comm'n v. Charter
Medical-Dallas, Inc., 665 S.W.2d 446, 452-53 (Tex. 1984).

 In conducting a substantial evidence review, we must determine whether the
evidence as a whole is such that reasonable minds could have reached the conclusion the agency
must have reached in order to take the disputed action. Charter Medical, 665 S.W.2d at 453. 
We may not substitute our judgment for that of the agency and may consider only the record on
which the agency based its decision. Texas State Bd. of Dental Examiners v. Sizemore, 759
S.W.2d 114, 116 (Tex. 1988), cert. denied, 490 U.S. 1080 (1989). The party bringing the appeal
bears the burden of showing a lack of substantial evidence. Charter Medical, 665 S.W.2d at 453. 
If substantial evidence would support either affirmative or negative findings, we must uphold the
agency's order, resolving any conflict in favor of the agency's decision. Auto Convoy Co. v.
Railroad Comm'n, 507 S.W.2d 718, 722 (Tex. 1974). 

 The Cities and Public Utility Counsel essentially argue that because the
Commission was not persuaded by the utility's argument that all Comanche Peak costs were
prudent, and because the utility then failed to quantify the impact of its imprudence by identifying
costs related to imprudent management, the Commission was required to disallow all of these
expenditures. (28) We do not agree. The Commission determined the evidence presented by the
parties did not provide an accurate foundation on which to base its disallowance decisions. It
therefore turned to the report prepared by the Nielsen-Wurster Group. Nielsen-Wurster had
previously performed twelve comprehensive prudence reviews of other nuclear plants, eight for
commissions and four on behalf of utilities, before it was retained by the Commission to evaluate
the planning and management of Comanche Peak. After an extensive investigation, Nielsen-Wurster offered its findings in ten days of testimony presented by five expert witnesses.

 The Cities and Public Utility Counsel argue that the evidence presented by Nielsen-Wurster cannot serve as a proper foundation for Commission decision-making because it does not
provide a sufficiently detailed breakdown of all Texas Utilities' expenditures identifying those
related to utility imprudence and those that would have been necessary absent any imprudence. 
They assert that in order to provide evidence sufficient to support the Commission's order, either
the utility or Nielsen-Wurster was required to "produce a breakdown of the Company's post-March 1985 expenditures, disaggregated between those that were `remedial' and those that would
have been incurred even absent the prolonged licensing delay." The argument urged on appeal
is that once the Commission has determined the utility's evidence is insufficient to demonstrate
that all expenditures were prudently incurred, the utility must then "isolate out the costs associated
with its imprudent conduct" in order to avoid having the Commission disallow all the costs
incurred. (29) In support of their argument, the Cities and Public Utility Counsel direct this Court
to Coalition of Cities v. Public Utility Commission, 798 S.W.2d 560, 563-64 (Tex. 1990), cert.
denied, 499 U.S. 983 (1991), in which the supreme court stated that "[a] party who fails to meet
its burden of proof loses." In Coalition of Cities, the utility "lost" because neither the utility nor
any other party satisfied the Commission that $1.453 billion in expenditures were prudently
incurred. Nowhere does the supreme court state that a utility must segregate imprudent costs. 
When a utility fails to persuade the Commission of the wisdom of all its expenditures, that does
not preclude the Commission from considering the other evidence presented in the rate-making
proceeding. Indeed, it is the Commission that is charged with sifting through the evidence and
deciding whether imprudent conduct caused certain expenditures. Having reviewed the utility's
evidence and the Nielsen-Wurster report, the Commission determined that $90.5 million of the
Comanche Peak Response Team expenses and $79.9 million of the Corrective Action Program
expenses were imprudent. The Commission made further disallowances for other imprudent
conduct associated with the delay in licensing; it disallowed $54.1 million in time-driven indirect
costs and $167.3 million in AFUDC.

 The Commission rejected Texas Utilities' claim that the costs associated with the
reinspection and revalidation program were entirely due to higher regulatory standards; it
similarly rejected the Cities and Public Utility Counsel's contentions that all such costs should be
disallowed as imprudent. The Commission accepted the Nielsen-Wurster study as evidence that
some, but not all, of the expenditures were imprudently incurred. The Commission found that
the NRC's Technical Review Team findings on the plant's condition were partly unfounded,
although they did identify weaknesses in the pre-1985 quality assurance program. The
Commission also concluded that the growth of regulatory requirements increased the cost and
extended the construction schedule beyond Texas Utilities' control. These findings are supported
by testimony adduced during the rate-making proceeding and provide substantial evidence upon
which the Commission could base its decision to examine all the costs in detail and make discrete
disallowances associated with imprudent conduct.

 The Cities and Public Utility Counsel vigorously assert that the Commission erred
in not making any disallowance for the costs of executing the Corrective Action Program. 
However, the Commission determined that although the imprudence of the utility was partially
responsible for the need to carry out the Corrective Action Program, the changed regulatory
climate would have made such a program necessary even in the absence of utility imprudence. 
The Commission's findings are presumed to be supported by substantial evidence, and the Cities
and Public Utility Counsel have failed to demonstrate that reasonable minds could not have come
to that decision based on this record. Charter Medical, 665 S.W.2d at 453.

 The Cities and Public Utility Counsel also complain that the Commission
improperly applied a "sliding" standard of prudence, assigning degrees of imprudence to utility
decisions and making disallowances only when the imprudence reached a certain level or degree. 
After reviewing the record we believe this criticism is unfounded. (30) The Commission determined
that the costs associated with responding to NRC concerns were necessary in part because of
utility imprudence and in part because of the NRC's application of higher safety and inspection
standards in the face of mounting concerns about the safety of nuclear power plants in general. 
The Commission's finding of fact 138 expresses this conclusion. (31) The Examiners' Report notes
that Texas Utilities' conduct was not the sole reason for the expenditures necessary to regain the
NRC's confidence. The Commission then made partial disallowances for the costs of the remedial
action program, not the wholesale disallowances recommended by the intervenors. After a careful
and thorough review of all the evidence presented in 203 days of hearings, the Commission made
findings of fact and conclusions of law based on that review. For each finding of imprudence in
the construction and management of Comanche Peak, the Commission made a disallowance for
the associated costs. (32) The Commission also made significant disallowances for the cost of the
delay in licensing, reflecting its opinion that the utility's imprudence was partially responsible for
that delay. 

 The Cities and Public Utility Counsel next contend that the Commission's order
is improper because it is not supported by underlying findings of fact. We understand their
complaint to be that the findings of fact do not meet the requirements of the APA. See APA §
2001.141(d) ("Findings of fact, if set forth in statutory language, must be accompanied by a
concise and explicit statement of the underlying facts supporting the findings.") The supreme
court has concluded that an agency's findings of fact need the additional support of findings of
underlying facts only when the findings are stated in terms taken directly from the enabling
legislation or when they "represent the criteria that the legislature has directed the agency to
consider in performing its function." Charter Medical, 665 S.W.2d at 451. The Cities and Public
Utility Counsel contend that findings of fact 138 through 152 are "ultimate" findings by which the
Commission fulfills its statutory obligation to exclude from rate base all imprudently incurred
post-1985 remedial costs, and as such they require underlying findings of fact. (33)

 We first consider whether the findings of fact at issue are indeed "ultimate
findings." In City of El Paso, this Court stated that although PURA does not expressly require
the Commission to make a finding of prudence before including costs in rate base, once the
Commission finds a major project to have been imprudently planned or managed, it should
generally disallow project costs to the extent of the imprudence. City of El Paso, 839 S.W.2d at
908. (34) A determination that an expenditure is imprudent carries the legal consequence of its
exclusion from rate base. Such a finding must be supported by underlying findings because it
embodies one of the criteria the Commission must consider in deciding whether to include the
particular expenditure in rate base.

 The following findings of fact are here at issue:



138. As discussed in Section VI.Q.2. of this Report, the evidence does not
support imprudence disallowances of the magnitude proposed by the
intervenors.

139. As discussed in Section VI.Q.2. of this Report, the costs of
executing the Comanche Peak Response Team and Corrective
Action Program were prudent.

140. As calculated in Section VI.Q.2. of this Report, the total imprudent
costs incurred by [Texas Utilities] through the end of the test year
is $537.9 million, which allocates $382.05 million to Unit 1 and
$155.85 million to Unit 2.



To meet the criteria set forth in Charter Medical and City of El Paso, these findings must be
accompanied by underlying findings connecting evidence to the conclusions expressed in the
Commission's ultimate findings. In support of finding of fact 138, the Examiners' Report
explains that the utility should not be prohibited from including any of the costs of the remedial
action program in rate base because other factors contributed to the NRC's application of stricter
regulatory standards. See Examiners' Report at 169. Those other factors are also identified in
the Report: "On balance, although the inspection standards and procedures applied by the
Technical Review Team were the same as those previously used by the project's quality control
inspectors, the Technical Review Team conducted its inspections and scrutinized its inspection
results at Comanche Peak in a manner as never before." See id. at 124. These findings support
the Commission's decision not to make the wholesale disallowances proposed by the intervenors. 
Nielsen-Wurster did not recommend disallowing any costs related to the post-effective date
execution of the response team or the corrective action program. See Examiners' Report at 139. (35) 
Finding of fact 140 expresses the Commission's final calculation of total imprudent costs incurred
by the utility through the end of the test year. These calculations are supported by extensive
explanations in the Examiners' Report as well as specific findings of fact in the order on rehearing
for each element of the total disallowance. We reject the Cities and Public Utility Counsel's
contention that findings of fact 138, 139, and 140 are not adequately supported by underlying
findings of fact. 

 Finally the Cities and Public Utility Counsel challenge the Commission's failure
to impose specific disallowances flowing from its finding that the utility imprudently failed to
infuse its senior management with personnel having the appropriate nuclear experience. During
the rate-making proceedings the examiners determined that it was impossible to state generally the
effect of this lack of nuclear experience; rather, as in the entire prudence review, the examiners
proposed an examination of the utility's discrete actions and decisions throughout the project. The
Commission adopted the examiners' reasoning and made disallowances for costs associated with
imprudent management. (36) These disallowances represent the Commission's exercise of its
discretion in determining rate base; the findings are not arbitrary or capricious or unsupported by
substantial evidence.

 After careful review and consideration of all the arguments raised by the Cities and
the Office of Public Utility Counsel, we overrule points of error two through four.



COMANCHE PEAK RESPONSE TEAM DELAY


 In its first point of error, Texas Utilities complains of the Commission's
disallowance of $194.4 million representing costs associated with an imprudent seven-month delay
in Comanche Peak construction. Each of the utility's arguments advanced under this point of
error, however, was presented to the Commission during the rate-making proceeding and rejected
with adequate accompanying findings supported by substantial evidence. We decline to substitute
our judgment for that of the Commission, and will overrule the point of error.

 The utility first argues that there is not substantial evidence to support the
Commission's finding that Revision 2 to the Comanche Peak Response Team Program Plan was
not a reasonable licensing response. To the contrary, the Commission relied on evidence that the
NRC Technical Review Team letter, issued on January 8, 1985, marked a distinct departure from
the NRC staff's previous position on Comanche Peak's licensability, and that the Comanche Peak
Response Team did not adequately address the outstanding licensing issues raised by the Technical
Review Team until the issuance of Revision 3 in January 1986. Findings of Fact 105, 109. The
Commission further found that Revision 2 should have included a sampling methodology
equivalent to that ultimately included in Revision 3. Finding of Fact 111. The Commission relies
on the Examiners' Report to further explain its finding:



[Texas Utilities'] contention that it could not anticipate the unacceptability of the
Revision 2 sampling methodology until after it filed Revision 2 is a red herring. 
The strongly worded third Technical Review Team letter suggested a possible
programmatic quality assurance/quality control breakdown, a position never before
expressed by the NRC staff.



Examiners' Report at 133. The utility simply failed to convince the Commission that, as it
reasserts in its brief, "it had every reason to believe that the entire program under Revision 2 .
. . would be acceptable to the NRC." The Examiners' Report outlines many of the same
arguments the utility now makes on appeal and explains its rejection of those arguments in light
of conflicting evidence and proposals and recommendations made by the Commission's staff.

 The utility next argues that even if there was a delay in preparing an adequate
response plan to NRC concerns, the delay had no impact on project duration because the project
schedule was controlled by a design validation of piping and pipe supports that began in mid-1985. Again, the Commission specifically rejected this argument when it was presented at the
rate-making proceeding. 



[T]he examiners reject [Texas Utilities'] argument that the delay in formulating an
adequate Comanche Peak Review Team Program Plan did not delay the completion
of Units 1 and 2. First, the Comanche Peak Review Team--the initial vehicle by
which the Company sought to assure licensability--constituted the critical path
activity for both units during this period. Therefore, any imprudent delay in
formulating an acceptable Comanche Peak Review Team Program Plan delayed
fuel load. . . . [Texas Utilities] argues that the 100 percent design revalidation of
large bore pipe and pipe supports, which commenced sometime in mid-1985,
constituted the critical path activity with respect to Unit 1 at this time. This
argument, however, is contradicted by the direct testimony of [Texas Utilities]
witness Mr. Manzi, who stated the Comanche Peak Review Team's activities paced
the project's schedule through early 1987.



Examiners' Report at 134 (emphasis added). Again, the Commission's decision is supported by
record evidence. In its brief, the utility asserts: "The Commission improperly rejected the
[utility's] evidence that the critical path activity during this period was not the sampling-based
CPRT activities but instead was the 100 percent design validation of piping and pipe supports .
. . ." This Court is bound by the Commission's determination as to the weight and credibility of
the evidence. As long as there is substantial evidence in the record supporting the Commission's
decision, we will not disturb its findings. Suburban Util. Corp. v. Public Util. Comm'n, 652
S.W.2d 358, 364 (Tex. 1983) (holding that the agency's action will be sustained if the evidence
is such that reasonable minds could have reached the conclusion that the agency must have reached
in order to justify its action).

 The utility next argues that the work performed pursuant to Revision 2 would have
been necessary under Revision 3, and thus failure to adopt Revision 3 until January 1986 had no
effect on the project schedule. To support this argument, the utility asserts: "There is no
evidence in the record that [work performed pursuant to Revision 2] was not necessary under
Revision 3." They point to record evidence that work performed in accordance with Revision 2
during the seven-month period was productive, useful, and necessary under the subsequent
Revision 3. The fact that work performed was productive, useful, and necessary does not,
however, foreclose the possibility that activities dictated by Revision 3 could have, and should
have, been carried out contemporaneously with the necessary Revision 2 activities. In other
words, nothing in the record states that the Revision 3 work could not have begun until all the
work done under Revision 2 was completed. The Commission specifically found that Revision
3 greatly expanded the scope of the Comanche Peak Review Team effort. This supports a finding
that the failure to expand the scope sooner caused delay in completing the project.

 Finally, the utility argues that even if the failure to implement Revision 3 until
January 1986 caused delay in completing Comanche Peak Unit 1, it had no effect on the completion of Unit 2. Again, we need look no further than the Examiners' Report for references
to evidence supporting the Commission's decision: "Unit 2 delay costs occurred in the same
manner as those for Unit 1; both were equally affected by the licensing quagmire in which the
entire project found itself. [Texas Utilities] witness Mr. Nace agreed that the licensing issues
facing Unit 1 also faced Unit 2." Examiners' Report at 134. The substantial evidence standard
is well established. Charter Medical, 665 S.W.2d at 452. We may not reweigh the evidence in
order to come to a conclusion different from the Commission's. Texas Utilities' arguments on
appeal are nothing more than a restatement of arguments and evidence considered by the
Commission and rejected in favor of other evidence and recommendations. We will not presume
to substitute our judgment for that of the agency, but rather uphold its findings that are reasonably
supported by substantial evidence. Texas Utilities' first point of error is overruled.




INCLUSION OF CWIP IN RATE BASE


 As part of Docket 9300, the Commission determined that the utility should be
allowed to include some "construction-work-in progress" (CWIP) costs in rate base. The term
"CWIP" refers to money dedicated to facilities that are currently under construction. Because it
is a state-regulated monopoly, a utility has the responsibility to provide utility service that meets
public demand. In a growing market, therefore, a utility must continually expand to create greater
capacity and must replace existing facilities as they wear out or become obsolete. Although these
projects require huge capital outlays, PURA does not allow a utility to include these costs in rate
base until the completed facility becomes "used and useful in rendering service to the public." 
PURA § 39(a). Before completion of a project, the utility includes these construction costs in a
separate CWIP account. A utility may be permitted to include some CWIP costs in rate base as
an exceptional form of rate relief upon a showing that their inclusion is necessary to the utility's
financial integrity. PURA § 41(a). In its order on rehearing, the Commission allowed the utility to include $695,177,625 of CWIP in rate base. In three points
of error, the Cities and Office of Public Utility Counsel challenge this decision.

 In its eleventh point of error, the Cities contend that the Commission violated Rule
21.69(a) when it allowed the utility to present evidence in the rate-making proceeding to justify
the inclusion of CWIP in rate base. (37) Rule 21.69(a) provided:



Any utility filing an application, petition, or statement of intent to change its rates
in a major rate proceeding must file all of its evidence, including the prepared
testimony of all of its witnesses and exhibits, on the same date that such
application, petition, or statement of intent to change its rates is filed with the
commission. . . . A utility filing for a change in rates shall be prepared to go
forward at a hearing on the data which have been previously submitted and sustain
the burden of proof of establishing that its proposed changes are just and
reasonable, and the material submitted as the filing and supporting work papers
shall be of such composition, scope, and format so as to serve as the utility's
completed case.



16 Tex. Admin. Code § 21.69(a) (1993) (since amended). (38) The Cities argue that Texas Utilities
did not include CWIP as a basis for rate relief in its request for a rate increase filed on January
16, 1990. They assert that, in fact, the utility affirmatively disavowed an intention to request
CWIP in the upcoming rate-making proceeding. The Cities allege that the utility's testimony
regarding the amount of CWIP necessary to maintain its financial integrity in the face of proposed
disallowances came as a complete surprise to the Cities and other parties to the proceeding and
was tantamount to the utility changing the basis of its request for a rate increase in contravention
of Rule 21.69(a).

 We disagree with the Cities' characterization of the utility's position on CWIP
presented in its rate filing package. Schedule C-4.1, included in the rate filing package, stated,
"The Company is not requesting any construction work in progress in rate base, as discussed in
the testimony of Mr. H. Dan Farell." Through Mr. Farell's testimony, the utility explains:



In this particular case . . . a relatively large level of CWIP attributable to
Comanche Peak Unit 1 as of June 30, 1989, is being transferred to rate base as
electric plant in service. Provided the Company's requested rate base and cost of
service levels are approved, the Company will have a reasonable opportunity to
reverse the negative trends and begin to restore the previously discussed financial
integrity measures to acceptable levels without the inclusion of CWIP in rate base. 
However, as discussed subsequently in conjunction with the overall cost of capital,
any material reductions in the Company's requested rate base or cost of service
will require reconsideration of the issue, and may well make inclusion of some
level of CWIP in rate base necessary.



(emphasis added). We are satisfied that the utility provided adequate notice of its intent to seek
inclusion of CWIP in rate base in the rate-making proceeding. The utility did not represent that
it would not request CWIP at all, but rather that it would seek to include CWIP in the event the
Commission materially disallowed its proposed rate increase, a very likely occurrence in any rate-making proceeding. Even though the utility's conditional request for inclusion of CWIP in rate
base appears to improperly treat CWIP as a means to offset the Commission's disallowance of
imprudent expenditures, it nevertheless satisfies the notice requirement of Rule 21.69(a) by
announcing that the utility intended to request inclusion of CWIP in rate base if disallowances
were recommended. Though the utility did not indicate what level of CWIP it would seek, it was
hardly in a position to do so before the rate-making proceeding began. We reject the Cities'
contention that they did not know the utility would seek inclusion of CWIP in rate base until the
final stages of the proceeding. The Cities' eleventh point of error is overruled.

 In their twelfth point of error, the Cities and Public Utility Counsel assert that the
Commission rewarded the utility's imprudence by making CWIP allowances to offset the
disallowances of imprudent expenditures. Although the utility announced its decision to seek
CWIP only if its rate request was substantially disallowed, we believe the Commission applied
the proper standard for including CWIP in rate base. The Commission determined that over $2
billion of Comanche Peak Unit 2 CWIP was prudent and could be included in rate base to the extent necessary to preserve the utility's financial integrity. Finding of Fact 169. The examiners
recommended that sufficient CWIP be included in rate base to allow the utility to recover up to
80 percent of its requested rate increase. In their report the examiners explained:



Including CWIP in rate base may appear to offset any prudence disallowance and
require the ratepayers to indemnify the shareholders. However, in reality, the
inclusion of CWIP in rate base does not offset a prudence disallowance. Instead,
it reflects a policy determination that in order to save the Company's financial
integrity so that the utility may continue to provide reliable service, the ratepayers
should pay now what they would soon pay anyway but in greater amounts.



Examiners' Report at 218. The Commission based its decision to allow CWIP in rate base on this
reasoning along with the utility's testimony regarding the need for CWIP in rate base to preserve
the company's financial integrity. Conclusion of Law 59. We conclude that the Commission
included CWIP in rate base to accomplish its proper purpose, consistent with the statutory
requirements. See PURA § 41(a). (39) Consequently, we overrule the Cities and Public Utility
Counsel's twelfth point of error.

 The thirteenth point of error asserts that the Commission failed to make proper
underlying findings of fact to support its decision to include $695,177,625 of CWIP in rate base. 
The Commission set this figure based on its conclusion that the utility required a rate increase of
10.1 percent, or $442,353,160, to maintain financial stability. We have already determined that
this order must be remanded to the Commission to reconsider disallowances associated with the
12.2 percent of the project repurchased from the minority interest owners. The Commission will
be required to reevaluate the utility's CWIP requirements in light of the level of disallowance on
remand. In making this determination, the Commission may only consider the financial condition
of the utility at the time of the hearing; it may not consider subsequent positive or negative
changes in the utility's financial integrity. Therefore, though we agree that the Commission could
properly consider including CWIP in rate base, we recognize that its decision as to the appropriate
amount of CWIP will change, and is dependent upon the disallowances it makes on remand. We
do not, therefore, review the findings related to CWIP allowances, as they will be superseded by
the Commission's findings when it reexamines the utility's need for CWIP under the
circumstances present at the time of the remand. The Commission will be required to reconsider
whether the 10.1 percent rate increase it found necessary to maintain financial integrity remains
the benchmark in light of changed circumstances. A consequence of our remand is to moot the
Commission's CWIP findings because they were calculated pursuant to erroneous disallowances. 
We do not, therefore, address the thirteenth point of error challenging the adequacy of the
Commission's findings to support a CWIP allowance that is now immaterial. Similarly, we do
not address the Cities and Public Utility Counsel's fourteenth and fifteenth points of error which
attack a specific finding of fact regarding the CWIP allowance.


GAS RECONCILIATION


 In their sixteenth and seventeenth points of error, the Cities and Public Utility
Counsel complain of error in the Commission's determination of the proper measure of imprudent
costs associated with Texas Utilities' purchases of gas from Texas Utilities Fuel Company (the
"Fuel Company"). 

 Part of Docket 9300 involved the reconciliation of fuel costs incurred by Texas
Utilities during the period from April 1, 1983, to June 30, 1989. Fuel reconciliation is a term
used to describe periodic adjustments to a utility's fuel costs made to account for the difference
between previously anticipated costs and actual, reasonable costs incurred. The Commission
makes these adjustments on a periodic basis because of the practical difficulty of deciding a new
rate case with each variation in fuel prices. In a hearing on fuel reconciliation, the utility has the
burden of proving that its fuel expenses during the reconciliation period were reasonable and
necessary expenses incurred to provide reliable service. See 16 Tex. Admin. Code 23.23(3)(B)
(1994). If the fuel is purchased from or provided by an affiliate, the utility must also show that
the price to the utility is no higher than prices charged by the supplying affiliate to its other
affiliates or divisions for the same item or class of items, or to unaffiliated persons or
corporations. PURA § 41(c)(1).

 As part of the fuel reconciliation proceedings in Docket No. 9300, Texas Utilities
sought to establish the reasonableness and necessity of $7,167,233,745 in natural gas costs
incurred during the six year reconciliation period. Upon reviewing the evidence, the Commission disallowed $29,173,090 of those costs and determined that the remainder were
reasonable and necessary expenditures. There is no dispute that the gas purchase transactions
reviewed by the Commission were affiliate transactions; the Fuel Company, an affiliate of Texas
Utilities, supplies all the utility's gas requirements. In addition, because Texas Utilities is the
Fuel Company's only customer, whether the Fuel Company charged Texas Utilities prices
commensurate with those charged to other affiliates or to unaffiliated entities is not an issue. The
Commission's only task was to determine the extent to which the affiliate fuel expenses were
reasonable and necessary costs that could be included in Texas Utilities' rate base. At issue in
the Cities and Public Utility Counsel's sixteenth and seventeenth points of error is the
Commission's decision to disallow only $29,173,090 in gas costs as unreasonable expenditures.

 The Commission arrived at this figure in the following way. First, it heard
evidence from Texas Utilities regarding the reasonableness of the approximately 900 gas contracts
subject to the reconciliation proceedings. Then it heard evidence presented by the Reed
Consulting Group, which reviewed 100 of the 900 contracts representing eighty percent of the gas
purchases made during the reconciliation period. In their report, the examiners reviewed sixty-four contracts, and after considering disallowances suggested by both Texas Utilities and the Reed
Consulting Group, made their own recommendations for disallowances for each contract. A chart
included in the Examiners' Report sets forth the disallowances recommended by Texas Utilities,
the Reed Consulting Group, and the examiners with respect to thirty-seven production contracts,
six long-term commercial contracts, thirteen short-term commercial contracts, and eight spot
contracts. See Examiners' Report at 448-51. (40) The Examiners' Report then includes a summary
section which states:



The examiners recommend a total disallowance for unreasonable expenditures for
gas purchases by [Texas Utilities] from its affiliate, [the Fuel Company], of
$78,504,776. The remainder of the Company's requested reconcilable gas costs,
$7,088,728,967, are reasonable and should be approved. (41)



Examiners' Report at 479. The chart and summary imply that the examiners accepted Texas
Utilities' evidence regarding the reasonableness of all the gas contracts not represented in the
chart, and allowed all costs related to those contracts in rate base. 

 In its final order, the Commission made specific findings of fact for each gas
contract that appeared in the examiners' chart, rejecting the examiners' recommended
disallowance in only five instances. (42) Like the examiners, the Commission only disallowed costs
associated with the contracts that appear in the examiners' chart. The Commission allowed all
costs associated with all other gas contracts. 

 In points of error sixteen and seventeen, the Cities and Public Utility Counsel
challenge the Commission's gas contract disallowances on two grounds: (1) the Commission did
not review all the affiliate gas costs associated with approximately 800 contracts making up twenty
percent of Texas Utilities' gas costs and as a result included unreasonable costs in rate base, and
(2) the Commission did not make the specific findings required by PURA section 41(c)(1) to
support the costs it did allow. Because we find both arguments to be without merit, we overrule
the sixteenth and seventeenth points of error.

 The Cities and Public Utility Counsel essentially argue that because the Reed
Consulting Group did not review the smaller and more numerous gas contracts making up
approximately twenty percent of Texas Utilities' gas costs, the Commission did not review the
contracts. Simply because the Reed Consulting Group did not include these contracts in its sample
does not mean that the Commission did not review those expenses or that there was no evidence
that the contracts met the requirements of PURA section 41(c)(1). 

 Texas Utilities presented evidence as to the reasonableness of all of the
approximately 900 gas contracts subject to the reconciliation proceeding. As part of its evidence
of reasonableness, the utility presented testimony justifying its decisions to enter into the various
gas contracts. (43) Opposing the reasonableness of Texas Utilities' gas contracts, the Cities' witness,
Richard S. Morey, recommended a disallowance of $452 million in gas-related expenditures. This
amount represented fuel costs for the years 1985 through 1988. The examiners determined that
Mr. Morey's quantification technique was seriously flawed because it relied on comparisons with
utilities not comparable to Texas Utilities. The examiners recommended that the Commission
reject Mr. Morey's analysis and his recommended disallowance, which the Commission did. If
that had been the whole of the evidence presented to the Commission, it would have been within
the Commission's discretion to allow all the costs requested by Texas Utilities if it found they
were supported by substantial evidence. However, the Commission also considered the evidence
presented by its own auditor and, as a result, disallowed some of the expenses associated with the
larger gas contracts. While the Commission may consider evidence such as that presented by the
Reed Consulting Group, it is not required to do so. In the absence of such evidence, it may accept
or reject the evidence presented by the utility, the party bearing the burden of proof of
reasonableness. With respect to the smaller gas contracts, the Commission apparently accepted
the evidence of reasonableness presented by Texas Utilities. If substantial evidence supports the
Commission's findings, which we conclude it does, we must uphold the order. See Auto Convoy,
507 S.W.2d at 722. 

 The Cities and Public Utility Counsel also maintain that the Commission did not
make the findings of fact required by PURA section 41(c)(1) to support an allowance of all gas
costs related to those contracts not included in the chart. The following are the portions of the
Commission order relating to its determination of gas disallowances:



Finding of Fact 379: The Company's fuel expenditures during the reconciliation
period of April 1983 through June 1989 should be approved to the extent of
$10,488,044,993.


Conclusion of Law 82: Except to the extent of the disallowed reconciliation period
gas costs (reflected in the Findings of Fact attached to the order), Texas Utilities
met its burden of proof under PURA § 41(c)(1), regarding affiliate transactions.


Conclusion of Law 83: Except to the extent of the disallowed reconciliation period
gas costs (reflected in the findings of fact attached to the order), the Company's
fuel expenditures during the reconciliation period comply with the requirements of
P.U.C. SUBST. R. 23.23(b)(2)(H).



The question for this Court is whether these findings satisfy the requirements of PURA section
41(c)(1) that "[a]ny such finding shall include specific findings of the reasonableness and necessity
of each item or class of items allowed." The Cities and Public Utility Counsel assert that this
statute demands specific findings of reasonableness for each contract. We disagree. The statute
allows the Commission to address its specific findings either to "each item" or "each class of
items." The Commission may either make a contract-by-contract determination of reasonableness,
or it may group the contracts together and declare them all to be reasonable.

 The Commission made a specific finding that, with the exceptions set forth in
findings of fact 383A-383AAA, Texas Utilities had established the reasonableness and necessity
of its gas costs. We conclude that these findings meet the requirements of PURA section 41(c)(1).



AMOCO CONTRACT NUMBER 1627


 In its sixth point of error, Texas Utilities claims that the trial court incorrectly
affirmed the Commission's decision to disallow $447,972 as imprudent gas expenditures pursuant
to Amoco contract number 1627. At the Commission hearing, Texas Utilities initially offered
evidence indicating that it had purchased fuel in March 1989 from Amoco pursuant to contract
number 1627, a spot contract. The Commission determined that the price paid for this gas was
unreasonably high given the spot price of gas at the time, and disallowed the excess purchase price
from rate base. During "surrebuttal testimony," the utility's fourth opportunity to file testimony
on fuel issues, it asserted that the gas purchase was not actually made pursuant to a spot contract,
but rather pursuant to a separate short-term commercial contract under which the price paid would
be reasonable. The utility explained that it had made an accounting error, forgetting to reform
its ledger to credit the purchases to the short-term contract. (44) The Commission treated the gas as
purchased pursuant to the spot contract and disallowed the $447,972 it believed to be in excess
of a reasonable spot price for gas.

 We do not agree with Texas Utilities that its testimony of an accounting error is
uncontroverted or that it necessarily established that the gas was purchased under a short-term
commercial contract as a matter of law. The Commission, rather, was presented with conflicting
evidence: the utility's own records showing the gas purchased pursuant to a spot contract and its
contradictory testimony that in fact the gas was purchased under a short-term commercial contract. 
The utility characterizes the Commission's decision to rely on the utility's records rather than the
testimony provided by the utility as arbitrary and capricious. We come to the opposite conclusion. 
The Commission is the judge of the weight to be accorded witnesses' testimony and is free to
accept part of the testimony of one witness and disregard the remainder. Southern Union Gas Co.
v. Railroad Comm'n, 692 S.W.2d 137, 141-42 (Tex. App.--Austin 1985, writ ref'd n.r.e.). The
Commission was not required to accept the utility's eleventh-hour accounting error explanation,
but was free to rely on the utility's own records. It is the utility that carries the burden of proof
at a rate-making proceeding; the utility that submits records to the Commission that do not
accurately reflect its expenditures does so at its own peril. The point of error is overruled. 



DELHI CONTRACT NUMBER 1659


 In the rate proceeding, Texas Utilities asserted that Delhi gas contract number 1659
contained a take-or-pay clause which obligated the utility to purchase a certain amount of gas
under the contract. The Commission considered the contract and determined that it imposed no
take-or-pay obligation and that Texas Utilities had purchased gas at a price higher than necessary. 
The Commission concluded that Texas Utilities' gas purchases pursuant to this contract violated
its obligation to purchase fuel at the lowest reasonable cost to ratepayers and disallowed
$2,509,810 in fuel costs incurred under the contract. See PURA § 41(c)(1); 16 Tex. Admin.
Code § 23.23(b)(2)(H) (1993) (since amended). In its third point of error, the Commission
contends that the district court incorrectly reversed this conclusion. Because we agree with the
Commission that the contract contained no take-or-pay provision, we will sustain this point of
error.

 The pertinent contract provision provides:



Delhi hereby grants [the Fuel Company] the option to purchase up to fifty percent
(50%) (calculated in terms of heating value) of the Schlensker-Texas Crude Gas,
purchased by Delhi, at Delhi's cost of such gas plus 5 cents/MMBtu. Such option
to purchase may be exercised by [the Fuel Company] at any time and from time to
time during the term of Delhi's respective gas purchase agreements for such gas
in blocks of ten percent (10%) of Delhi's purchases, and until [the Fuel Company]
has exercised completely its option to purchase such fifty percent (50%). Each
such exercise of its option to purchase by [the Fuel Company] shall be evidenced
by not less than thirty (30) days prior written notice to Delhi and shall be effective
on the first day of the month following that month in which the said thirty (30) day
period expires.



Contrary to Texas Utilities' assertions, this contract embodies no take-or-pay obligations. It is
apparent from its unambiguous terms that the contract gives Texas Utilities the option to buy, in
ten percent blocks and at a fixed price, up to fifty percent of any Schlenker-Texas crude gas
purchased by Delhi. We are not persuaded by Texas Utilities' argument that the phrase "and until
TUFCO has exercised completely its option to purchase such fifty percent" means that once the
utility has purchased at that level it must continue to do so. The contract contemplates that
whenever Delhi purchases Schlenker-Texas crude gas the Fuel Company may purchase up to fifty
percent of that gas at Delhi's cost plus five cents per MMBtu. The phrase "and until [the Fuel
Company] has exercised completely its option to purchase such fifty percent" sets an upper, rather
than a lower, limit on the utility's right to purchase this gas at the contract price; it does not
operate to convert the option to purchase gas into an obligation. We sustain the Commission's
third point of error.



FUEL OIL INVENTORY


 In its fourth point of error, Texas Utilities challenges the Commission's decision
to set fuel oil inventory at 1.7 million barrels. The utility contends that this finding is arbitrary
and capricious, and not supported by substantial evidence. See APA § 2001.174 (E), (F). We
disagree. 

 Texas Utilities requested a fuel inventory level of 2,031,540 barrels, an increase
of 331,540 barrels from the previously authorized level of 1.7 million barrels. See Application
of Texas Utilities Electric Company for a Rate Increase, 10 P.U.C. Bull. at 954. The higher
figure was based on the utility's test-year end thirteen-month average inventory of fuel oil. The
Cities argued that the utility needed a fuel oil inventory of only 1,279,363 barrels, suggesting that
access to nuclear-generated power from Comanche Peak Unit 1 reduced the utility's need for fuel
oil. Additionally, the Cites contended that increased levels of non-oil/gas fired generation caused
a decrease, rather than an increase, in the necessary fuel oil inventory level. Texas Utilities
countered that it burned 1,201,008 barrels of oil in December 1983 and 1,249,952 barrels during
two cold weather periods in February and March 1989. The utility hoped to demonstrate that the
Cities had miscalculated its needs in the event of cold weather.

 The Commission rejected both the Cities' and the utility's requests, adopting
instead the examiners' recommendation that the "level of fuel oil inventory established in Docket
No. 5640 of 1.7 million barrels should be left in place." This decision was not arbitrary and
capricious or unsupported by substantial evidence. The examiners based their recommendation
on an evaluation of the utility's actual needs since the 1.7 million barrel inventory level was
established in 1984. The examiners stated, "[I]n light of the Company's experience, the
examiners find that the level of fuel oil inventory established in Docket No. 5640 of 1.7 million
barrels should be left in place by the Commission." The utility's actual experience over the past
several years provides probative evidence from which the agency could conclude what the utility's
future needs will be. If the utility could convince the Commission of the need to increase that
level, then such an increase would be in order. The burden, however, was on the utility. Texas
Utilities' fourth point of error is overruled.



RETURN ON COMMON EQUITY (45)


 In points of error eighteen through twenty, the Cities and Public Utility Counsel
challenge the trial court's affirmance of the Commission's decision to set the utility's return on
common equity at 13.2 percent. (46) Specifically, they contend that the Commission (1) did not
identify the methodology it used to arrive at this figure; (2) failed to consider the statutory factors
set out in PURA section 39(a); and (3) did not make adequate findings of fact.

 During the rate-making proceeding, all the presentations regarding the appropriate
return on common equity used some form of a discounted cash-flow methodology. Because this
methodology was the only one presented, the Commission's adoption of any of the range of
figures presented as the appropriate return on common equity in itself entails adoption of the
discounted cash-flow methodology. The Commission's order is presumed to be based on
substantial evidence and we will not require the Commission to make a separate finding simply
to confirm that it has based its decision on the only method of calculating return on common
equity presented during the rate-making proceeding. See Charter Medical, 665 S.W.2d at 451;
see also GTE-SW, 833 S.W.2d at 159 (holding that a return on equity falling within the range
presented by expert testimony meets the substantial evidence test). We reject the Cities and Public
Utility Counsel's attempts to look to the transcript of the Commission's final order meeting to
show that the Commission based its decision regarding return on common equity on something
other than record evidence. We judge the agency order on the basis on which it purports to rest,
and the mental processes of individual commissioners are immaterial to judicial review. 
Pedernales Elec. Coop., Inc. v. Public Util. Comm'n, 809 S.W.2d 332, 341 (Tex. App.--Austin
1991, no writ); see also City of Frisco v. Texas Water Rights Comm'n, 579 S.W.2d 66, 72 (Tex.
Civ. App.--Austin 1979, writ ref'd n.r.e.) ("The thought processes or motivations of an
administrator are irrelevant in the judicial determination whether the agency order is reasonably
sustained by appropriate findings and conclusions that have support in the evidence."). 

 The Cities and Public Utility Counsel next argue that the Commission failed to
consider the necessary statutory criteria in choosing the appropriate return on common equity. 
The statute directs the Commission to consider, among other things, the utility's efforts to comply
with the statewide energy plan, its efforts and achievements in the conservation of resources, the
quality of its services, the efficiency of its operations, and the quality of its management. PURA
§ 39(b). Our examination of the order reveals findings of fact and conclusions of law addressing
each of these criteria. The Commission addressed the utility's operational efficiency, finding that
the utility generated electricity efficiently and reliably during the reconciliation period and that
the energy efficiency plan satisfied the Commission's substantive rules. Findings of Fact 396,
398. Conclusion of law 58 states that Texas Utilities' generation, transmission, and distribution
facilities are safe, adequate, efficient, and reasonable. Regarding the quality of management, the
Commission found that, with limited exceptions, the quality of management was adequate. 
Finding of Fact 12. The Commission also considered the utility's efforts and achievements in
conservation and compliance with the statewide energy plan. See Finding of Fact 215 ("Staff's
recommended 15-basis-point upward adjustment to recognize the Company's exceptional
achievement in conservation and load management is reasonable."); Finding of Fact 401 ("[Texas
Utilities'] demand side management achievements have been remarkable, commendable, and
clearly far above those of other utilities."). 

 The chief complaint appears to be the Cities and Public Utility Counsel's perception
that the Commission made no downward adjustment to the return on common equity to penalize
the utility for instances of imprudent management. While the statute instructs the Commission
to consider the quality of the utility's management, it does not require that the Commission lower
the return on common equity if it finds any imprudence. We understand the statute to leave to
the Commission's discretion the decision whether the utility's management warrants a reduction
in the overall rate of return. We also reject the assertion that the Commission's chosen rate of
return is not supported by adequate findings. The utility testified to a recommended range of
return from 13 to 14.25 percent. The staff's recommendation ranged from 12.36 to 13.4 percent. 
The Examiners' Report summarizes extensive testimony supporting the various ranges sponsored
by the parties and the staff. The Commission made a specific finding that a 13.2 percent return
on common equity is reasonable and appropriate for the utility. Finding of Fact 213. This Court
has already decided that a finding regarding the appropriate cost of equity is not a finding set forth
in statutory language, and therefore needs no underlying findings. City of Alvin, No. 3-92-459-CV, slip op. at 28; see also GTE-SW, 833 S.W.2d at 158 (approving a finding on return on equity
that was "the Commission's own estimate converted into a finding" so long as the estimate was
"within the range made by the testimony of the various expert witnesses"). Choosing a rate of
return is a proper exercise of the Commission's discretion in setting the rate of return, and we will
not require any more specific findings than its selection from a range of rates all supported by
credible expert testimony. The Cities and Public Utility Counsel's points of error eighteen
through twenty are overruled.



CASH WORKING CAPITAL
 

 Texas Utilities' fifth point of error complains of the district court's decision to
remand the Commission's cash working capital allowance. The district court found, and the
Commission agreed, that the Commission made a mathematical error in its calculation of the cash
working capital. On appeal, Texas Utilities argues that there is no evidence that the Commission
made a mathematical error and that in any case the district court could not address the issue
because it was not raised in the motions for rehearing filed with the Commission. See APA §
2001.145. We do not address this point of error. On remand the Commission will have an
opportunity to recalculate the cash working capital and correct its mathematical error or make
other changes to cash working capital in light of its decisions on remand.



CONCLUSION


 For the reasons stated in this opinion, we reverse the district-court judgment and
remand the cause to the district court with instructions that it be remanded to the Commission for
further proceedings consistent with this opinion.



 

 Bea Ann Smith, Justice

Before Chief Justice Carroll, Justices Aboussie and B. A. Smith

Reversed and Remanded

Filed: June 15, 1994

Publish

1.   Cities of Arlington, et al. includes the municipalities of Addison, Allen, Azle,
Belton, Breckenridge, Bridgeport, Burkburnett, Burleson, Carrollton, Celina,
Centerville, Cleburne, Colleyville, Copperas Cove, Corinth, Crowley, Dalworthington
Gardens, De Leon, Denison, Euless, Farmers Branch, Forest Hill, Fort Worth, Glen
Heights, Grand Prairie, Granger, Hewitt, Howe, Hurst, Irving, Keller, Lindale, Luella,
McKinney, Milford, Murchison, New Chapel Hill, Ovilla, Pantego, Plano, Ranger,
Richardson, Roanoke, Rockwall, Rosser, Rowlett, Sherman, Sunnyvale, The Colony,
Tyler, University Park, Venus, Waco, White Settlement, and Wichita Falls. In addition
to bringing individual appeals, each of the appellants is also an appellee with respect to
certain parts of the district-court judgment.
2.   All citations in this opinion are to the current Administrative Procedure Act rather
than the former Administrative Procedure and Texas Register Act because the recent
recodification did not substantively change the law. Act of May 4, 1993, 73d Leg., R.S.,
ch. 268, § 47, 1993 Tex. Gen. Laws 583, 986.
3.   With one exception, the Cities and Public Utility Counsel jointly raised their points
of error.
4.   APA section 2001.174 directs this Court to reverse and remand a cause for further
proceedings only if substantial rights of the appellant have been prejudiced because the
administrative findings, inferences, conclusions, or decisions are: (1) in violation of a
constitutional or statutory provision, (2) in excess of the agency's statutory authority, (3)
made through unlawful procedure, (4) affected by error of law, (5) not reasonably
supported by substantial evidence, or (6) arbitrary or capricious or characterized by
abuse of discretion or clearly unwarranted exercise of discretion.
5.   Meek recused himself from voting on three issues: (1) finding of fact 172 relating to
the reasonableness of Texas Utilities' fuel oil inventory, (2) finding of fact 379 relating to
the reasonableness of Texas Utilities' fuel expenditures during the reconciliation period
insofar as such expenditures relate to gas contracts between the utility and Fina, and (3)
finding of fact 389 relating to the reasonableness of Texas Utilities' fuel oil expenditures
during the reconciliation period.
6.   Section 63 expressly provides that it shall not be construed as applying to the
purchase of units of property for replacement or to additions to the public utility's
facilities by construction. 
7. [7]  The Examiners' Report notes:


In the petition and statement of intent initiating this docket, [Texas Utilities]
requested that "the public interest and other findings be made favorably"
with respect to its repurchases of the minority owner interests. [Texas
Utilities'] pleading also cited § 63 as one of the statutory provisions granting
the Commission jurisdiction over [Texas Utilities'] application. [Texas
Utilities] now contends that § 63 does not apply to its reacquisition of the
minority owners' interests in Comanche Peak. It instead argues that the
Commission should determine the prudent cost of 100 percent of Comanche
Peak, rather than just 87.8 percent of the plant, in determining the extent to
which the costs of the 12.2 percent repurchased plant are included in rate
base.


The Report goes on to state:


The relevant precedent [for applying § 63] . . . is found in the three dockets
in which the Commission approved the CCN amendments reflecting the
Company's reacquisition of the minority owners' interests: Docket Nos.
8015, 8236, and 8736.


In each of those dockets' final orders, the Commission envisioned a future
§ 63 review of [Texas Utilities'] buyback of a minority owner's interest. . . .
[Texas Utilities] did not file a motion for rehearing in any of the final orders
in the CCN dockets related to the repurchases of the minority owners'
interests, even though each of the final orders envisioned a future § 63
review.
8.   Texas Utilities Electric Company ("Texas Utilities" ) is the principal subsidiary of
Texas Utilities Company (the "Holding Company"), an investor-owned holding company. 
Texas Utilities was created in 1984 after the merger of Dallas Power & Light Company,
Texas Electric Service Company, and Texas Power & Light Company--all Holding
Company subsidiaries.
9. [9]  Joint ownership agreements executed with Texas Municipal Power Agency and Brazos
Electrical Power Cooperative described the ownership of Comanche Peak as follows:


3.01 Ownership: The Parties shall have title to the Project and Fuel as tenants
in common and shall, as co-tenants with an undivided interest therein, subject to
the terms of this Agreement, own the Project and Fuel and have the related
rights and obligations . . . . (emphasis added).


The agreement also contains a provision whereby the parties to the agreement waive the right
to partition their interest in the project. 
10.   In exchange for the ownership interest, each minority interest owner agreed to
advance sufficient funds to pay its ownership interest share of the project's construction
and operation costs. Additionally, each minority interest owner agreed to pay its
percentage share plus interest of the accumulated costs of fuel and construction paid by
Texas Utilities before the applicable date of closing. The minority interest owners
essentially agreed to assume financial responsibility for a percentage of the cost of
building the plant in exchange for a corresponding percentage undivided interest in the
completed plant. Once the plant was operating, the minority interest owner was entitled
to capacity equal to its percentage share of Comanche Peak's net effective generation.
11.   For example, in Docket No. 3589, the Commission reviewed the transfer of a four
and one-third percent ownership interest in Comanche Peak from Texas Utilities'
corporate predecessors to Tex-La Electric Cooperative. Though PURA section 63 was
cited as one of the statutory provisions giving the Commission jurisdiction to review the
sale, the Examiners' Report states, "Because only a portion of [a] joint interest is being
conveyed, it may not be necessary to comply with § 63 of the Act because it speaks to the
transfer of `. . . any plant as an operating unit or system . . . .'" 
12.   The repurchase prices were based on the cost of building the percentage of the
plant owned by each seller. Therefore, it appears that Texas Utilities reacquired the
interests by reimbursing each minority interest owner the money each had contributed to
the construction and operation of the plant. Additionally, Texas Utilities agreed to
repurchase nuclear fuel and transmission facilities, and to reimburse the minority interest
owners' litigation expenses. These payments together constitute the settlement costs paid
by Texas Utilities to the minority interest owners. The Commission reviewed these
settlement costs under PURA section 63 and made the following disallowances:


Repurchase of 12.2% Ownership Interest $811,342,938


Reimbursement of Litigation Expenses $ 72,684,000


Repurchase of Nuclear Fuel $ 24,662,000

 

Total $908,688,938
13.   It does not appear, however, that purchasing a stand-alone coal plant was an option
available to the utility in its attempts to resolve the litigation quagmire that threatened the
entire project. The utility was required to obtain a license for the Comanche Peak power
plant; it could not choose to license 87.8 percent of the capacity and turn to alternative
power sources for more capacity. The 12.2 percent was part of the whole project, and
until the dispute with the minority interest owners was resolved, the entire plant would
remain inoperative.
14.   The Cities and Public Utility Counsel argue that the standard applied by the
Commission in its section 63 review is identical to the standard employed in the typical
"prudence review" of a rate-making proceeding, and for that reason the Commission's
findings should be affirmed even if this Court determines that section 63 is inapplicable to
this transaction. Assuming, without deciding, that the standards are the same, we would
still reverse the Commission's disallowances because they are arbitrary and capricious. 
In Docket 9300, the Commission adopted the following prudence standard:


The exercise of that judgment and the choosing of one of that select range of
options which a reasonable utility manager would exercise or choose in the
same or similar circumstances given the information or alternatives
available at the point in time such judgment is exercised or option is chosen.


If the Commission indeed applied a prudence standard when evaluating the repurchase,
the resulting findings of fact are arbitrary and capricious because they reflect
consideration of a factor legally irrelevant to a review of expenditures under the prudent
investment standard. See Public Util. Comm'n v. South Plains Elec. Coop., Inc., 635
S.W.2d 954, 957 (Tex. App.--Austin 1982, writ ref'd n.r.e.) (citing Starr County v. Starr
Indus. Servs., Inc., 584 S.W.2d 352 (Tex. Civ. App.--Austin 1979, writ ref'd n.r.e.), for the
proposition that an agency's consideration of a non-statutory factor amounts to arbitrary and
capricious action requiring reversal); John E. Powers, Agency Adjudications 165 (1990). The
Commission disallowed the purchase price to the extent that it exceeded the cost of building a
stand-alone coal plant with capacity equivalent to 12.2 percent of Comanche Peak's. Building
a stand-alone coal plant was not, however, one of the options available to the utility at the time
it made the repurchase. The purpose of repurchasing the minority interests was not to obtain
capacity, but to eliminate expensive and time-consuming litigation that jeopardized licensing of
the entire project; building or buying a coal plant would not achieve that objective. 
15.   Finding of fact 148 states:


For the reasons discussed in Section VII.C.1. of this Report, settling the
minority owner litigation was reasonable from [Texas Utilities'] perspective.


The Report noted that "it is clear that the minority owner litigation potentially threatened
the Company's licensing efforts, which in turn threatened further schedule delays and
cost overruns on the project. At the time of the settlements with the minority owners, the
project was incurring approximately $60 to $70 million a month in case requirements and
carrying costs. Consequently, a settlement of the minority owner litigation was
reasonable in order to avoid the possibility of any further project delay and unnecessary
expenditures of these amounts."
16.   We realize the Commission has already conducted an overall prudence review of
the costs associated with the original construction of Comanche Peak resulting in a
disallowance of approximately $537 million. Rather than hold that this figure is the
appropriate disallowance, we note that the question on remand is not whether the original
construction costs of the 12.2% at issue here were prudently incurred, but rather whether
it was prudent for the utility to repurchase that portion of the plant at its original cost. 
17.   Public Utility Counsel does not join the Cities in bringing this point of error.
18.   This discussion focuses on the more typical situation in which a utility requests a
rate increase rather than a decrease.
19.   Original jurisdiction over rate proceedings is divided between the governing body
of each municipality ("the municipality") and the Commission. Each municipality
exercises exclusive original jurisdiction over electric rates and services within its corporate
limits ("municipal areas"), whereas the Commission exercises exclusive original
jurisdiction over rates and services in all other areas ("non-municipal areas"). PURA §
17(a), (e). In addition, the Commission has exclusive appellate jurisdiction to review each
municipality's order in any rate proceeding. PURA § 17(d).
20.   The statute defines a "major change" as an increase in rates that will augment the
aggregate revenues of the utility making the rate application by more than $100,000 or
two and one-half percent, whichever is greater. PURA § 43(b).
21.   In this case, for example, there were 203 days of hearings. This means the utility
might not be allowed to increase its rates for as many as 526 days. 
22.   "Regulatory lag arises from the loss in revenue experienced by a utility whose rates
are in need of upward adjustment during the period between filing an application for a
rate increase and the date when relief is granted." Railroad Comm'n v. Lone Star Gas Co.,
656 S.W.2d 421, 423 (Tex. 1983).
23.   PURA section 3(g) provides that the term "regulatory authority" means either the
governing body of any municipality or the Commission, depending upon the context in
which the word is used. 
24.   When considered in conjunction with other provisions of PURA, the Cities'
interpretation of section 43(e) leads to the result that a utility will never be able to
implement bonded rates in municipal areas. Section 43(e) specifically states that a utility may
not put bonded rates into effect until 150 days have passed. Because the municipality loses its
jurisdiction after only ninety days, a utility's right to bonded rates will always arise after the
municipality has lost its original jurisdiction over the rate proceeding.
25.   Moreover, the supreme court expressly limited the effect of its decision in Lone Star
Gas to cases arising before September 1, 1983, the effective date of significant amendments to
PURA. Lone Star Gas, 656 S.W.2d at 427. 
26.   It is more sensible to view interim rates and bonded rates as separate and
independent methods by which a utility may obtain rate relief in its entire service area,
rather than alternative procedures for setting rates inside and outside city limits. A utility
might first request interim rates in order to avoid posting a large bond. If the Commission did
not approve the interim rates, the utility could then post a bond, which it would risk losing
entirely or in part if final rates set by the Commission were lower than the bonded rates.
27.   In March 1984, the NRC formed a Technical Review Team to identify and resolve
all regulatory issues raised by Texas Utilities' attempt to obtain an operating license. The
utility, in turn, created the Comanche Peak Response Team to assess and resolve any
issues raised by the Technical Review Team. In January 1985, the Technical Review
Team issued a letter suggesting that Comanche Peak was deficient in the areas of quality
assurance and quality control. In response, the utility formed the Design Adequacy
Program and the Corrective Action Program to address the NRC's concerns and ensure
that Comanche Peak received an operating license. The NRC issued a license for
Comanche Peak Unit 1 in February 1990.
28.   The Commission rejected several of Texas Utilities' attempts to justify costs
associated with Comanche Peak. For example, the Commission found: (1) the plant cost
comparisons tendered by the parties were not credible for purposes of establishing a
reasonable cost, (2) the cost variance analysis tendered by the utility had limited, if any,
value in a prudence review of Comanche Peak, (3) the schedule variance analysis tendered
by the utility did not credibly evaluate the post-March 1985 schedule extensions, and (4)
the present value revenue requirements analysis and capital cost correction analysis
tendered by Texas Utilities were improper methodologies for quantifying the impact of a
seven-month delay. However, the Commission's final order shows that it did accept
much of Texas Utilities' and the Nielsen-Wurster Group's evidence supporting the
prudence of a variety of decisions related to the overall construction and management of
Comanche Peak.
29.   This Court has previously rejected similar arguments. In City of El Paso v. Public
Utility Commission we held:


Requiring the Commission to adopt or reject witnesses' testimony in toto,
especially when the testimony concerns a multi-faceted issue such as [prudence],
would hobble the Commission's ability to assess each witness and render its
decision based solely on the testimony it found credible.


City of El Paso v. Public Util. Comm'n, 839 S.W.2d 895, 906-07 (Tex. App.--Austin 1992,
writ granted).
30.   The Cities and Public Utility Counsel base their argument on the following
statement contained in the Examiners' Report: "Although the examiners conclude that
certain [Texas Utilities] management decisions were imprudent and undoubtedly
contributed to the Company's licensing problems, they do not find that those practices
rise to the level of imprudence which would justify a substantial disallowance of
Comanche Peak costs." That the Report expresses only the view that not all costs should
be disallowed because they were not all occasioned by utility imprudence is clarified by
the examiners' careful explanation of their position:



True, certain unreasonable conduct unquestionably contributed to the NRC
staff's shift in position with respect to its expectation of proof, as reflected
in the Third Technical Team letter, but other circumstances also
contributed to this change in position. In other words, the imprudent
conduct of [Texas Utilities] did not result in the necessity to incur all of the
post-1984 costs.
31.   Finding of fact 138 states: "As discussed in Section VI.Q.2. of this Report, the
evidence does not support imprudence disallowances of the magnitude proposed by the
intervenors."
32.   The Commission made the following disallowances:


Item Amount (Millions of Dollars)


Electrical Labor 51.3

Electrical Penetration Assemblies 16.2

Electrical Switchgear 4.1

Heating, Ventilation & Air Conditioning 60.1

Reactor Pressure Vessel Supports .4

Diesel Generators 10.6

DAP Root Cause Analysis 3.2

CPRT Start-Up Costs 90.5

CAP Start-Up Costs 79.9

Construction Permit Lapse .2

 

TOTAL $ 316.5
33.   We limit our discussion to findings of fact 138, 139, and 140. The Cities and Public
Utility Counsel waive any separate attack on findings of fact 141 and 142 in their brief,
stating that they consist primarily of calculations that "fall out" of the three previous
findings. We understand this to mean that if the three preceding findings are sufficient,
there is no independent reason that findings of fact 141 and 142 are improper. Findings
of fact 143 through 152 are addressed separately in this opinion.
34.   This Court held:


The "statutory language" to which [APA § 2001.141(d)] refers is the
language in the statute that confers authority on the agency to take the
complained-of action. In PURA, the legislature authorized the Commission
to make orders setting rates. A number of PURA's sections also detail the
criteria the Commission is to consider in setting rates. Therefore, only
when the Commission's findings are stated in PURA's express terms, or
when they represent criteria the legislature has directed the Commission to
consider, must the Commission also make findings of underlying fact.


City of El Paso, 839 S.W.2d at 908 (citations omitted) (emphasis added).
35.   The Report also provides several references to the administrative record including
pages 28200-28204 of the statement of facts.
36.   For example, the Commission found that Texas Utilities management's lack of
nuclear experience caused the imprudent decision to discontinue the integrated cube
schedule and implement a start-up driven schedule in May 1980. This led to reduced
productivity in electrical craft labor from June 1980 to September 1981. See Findings of
Fact 40, 41, 42. Accordingly, the Commission disallowed $51.3 million in electrical craft
labor costs. The Commission also disallowed $90.5 in costs expended in developing an
effective Comanche Peak Response Team program plan and $79.9 million in start-up costs
associated with the Corrective Action Program, having concluded that these costs arose from
management's imprudent decision to discontinue its comprehensive policy of updating original
design drawings. See Findings of Fact 78, 79. 
37.   Public Utility Counsel attempts to join the Cities in bringing this point of error. 
However, because its motion for rehearing filed with the Commission does not raise this
claim, it has waived the right to raise it on appeal. APA § 2001.171 (requiring a party to
a contested case to exhaust administrative remedies before seeking judicial review).
38.   The Commission established this rule pursuant to PURA section 43(a) which
provides:


The statement of intent [to change rates] shall include proposed revisions of
tariffs and schedules and a statement specifying in detail each proposed
change, the effect the proposed change is expected to have on the revenues
of the company, the classes and numbers of utility customers affected, and
such other information as may be required by the regulatory authority's rules
and regulations. 


PURA § 43(a) (emphasis added). 
39.   That CWIP allowances were not made as a direct dollar-for-dollar offset of
imprudence disallowances is clear when comparing the total disallowance for Comanche
Peak Units 1 and 2, $1,381,144,563, with the amount of CWIP included in rate base,
$695,177,625. This is consistent with the Commission's obligation to include CWIP in
rate base only to the extent necessary to ensure the utility's financial integrity.
40.   There is no explanation in the Examiners' Report as to why the Examiners did not
include all 100 contracts reviewed by the Reed Consulting Group in their chart. 
41.   We note that a chart entitled Summary of Recommended Disallowances-Gas Contracts
appearing on page 434 of the Examiners' Report shows an additional recommended
disallowance for open access transportation. The total recommended disallowance on this
chart is therefore $81,504,776. Without explanation, in the summary section on page 479, the
examiners dropped this $3 million disallowance leaving a recommended total disallowance of
$78,504,776. 
42.   The Commission disallowed less than the examiners recommended in four
instances:


Contract No. Examiners' Recommendation Commission's
Disallowance


1690 (Empire) $ 19,222,738 $ 0


3205 (PG&E) $ 13,453,686 $ 0


3697 (Coronado) $ 1,916,756 $ 1,455,193


3011, 3701, 3707

(Houston Pipeline,

Panhandle) $ 16,721,007 $ 0


The Commission disallowed more than the examiners recommended in one instance:


Contract No. Examiners' Recommendation Commission's
Disallowance


3076 (Amalgamated) $ 0 $ 527,308 
43.   Texas Utilities asserted that its three major gas contracts expired between late 1980
and 1983, at a time when its forecasts showed a continuing increase in the cost of natural
gas and when prices were still escalating. The utility entered into new contracts during a
sellers' market with the result that the new contracts were less favorable to the utility
than they would have been if they had entered into them at another time. Texas Utilities
attributes its failure to obtain gas in an interstate market to a desire to remain free from
burdensome and expensive federal regulation.
44.   The utility's testimony was that it had for a short time credited purchases made
pursuant to a short-term commercial contract with Amoco to contract number 1627
because of delay in setting up the short-term contract for payment. Presumably, the
utility only realized its failure to change its records after the rate-making proceeding had
been under way for some time.
45.   We understand "common equity" to mean the utility's common stock. We refer to
the utility's common stock as "common equity" so as not to deviate from the terminology
used by the Commission in the proceeding below. See GTE-SW, 833 S.W.2d at 157 n.3.
46.   Return on equity is one element of the rate of return on a utility's invested capital. 
Other elements include long-term and short-term debt and preferred stock.